Case Number 22-1056 et al., Electric Energy, Inc. et al. Petitioners v. Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency, and Case Number 23-1035 et al., Electric Energy, Inc. et al. Petitioners v. Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency. Mr. Gestair for the issues. Ms. VanBelligen for the petitioners, Gavin Bauer-specific issues. Mr. Mitchell for the respondents. Mr. Carney for the intervenors. Sierra Club. Thank you, Your Honor. I please the court. Stephen Gidaire for petitioners. I will address the legislative rule issue and counsel for Gavin Bauer. Ms. VanBelligen will address the I would like to reserve three minutes for rebuttal, if I might. As the court knows, in 2015, EPA issued its regulations for the disposal of coal combustion residuals. The statute RCRA calls these solid waste criteria. We are here today because EPA revised those criteria in January of 2022, and it did so through a series of informal documents and without following the statutory procedures. I would like to make three points in my argument this morning. First, that the statutory context matters. Second, that the term infiltration, which I'm sure the court has now read more about and wanted to, has to be read in the context of the regulations and not removed entirely from that context, as EPA's general dictionary definition does. And third, that EPA said the opposite in 2015 when it explained what these regulations meant. But before I do address these points, I would like to put this case in the context of the USWAG decision, prior USWAG decision from this court. In that case, this court considered how EPA's 2015 regulations apply to operating impoundments, impoundments that are still receiving tons of CCR waste and that are holding millions of gallons of water that cause the risk of leaking and rupture. This court put that risk at between 36 and 57 percent, based on the record in that case. This case is different. This case is about closing impoundments. It's not about operating impoundments. And that same record shows that when you close those same impoundments by either method under the regulations, which I'll discuss, the risk of harmful leakage and rupture drops dramatically. That's EPA's finding in the record at 571. And that is true of both closure options. The regulations provide options for how you close. Either you can excavate all the CCR material, transport it somewhere else for disposal with all the health and environmental risks that that involves, or you can leave it where it is, drain the water, engineer and install a final cover system, and you can monitor the groundwater at the edge of the CCR waste unit for 30 years to prove that there is no groundwater contamination. And when you do either of those things, the record shows that the risk drops dramatically. That's why EPA provided optionality. The reason it drops dramatically is because you removed what's best. That's the force of those millions of gallons of water that had been removed before you closed the units. So if you fast forward to January... I understand the hydraulic head point to be absolutely central to your position. Is that right? I think it's central to the reason why this condition doesn't violate the statutory standard. I think it's clear even without that that EPA has issued a new legislative rule regardless. The latter I'm not sure I follow because the common sense view would be that if the concern about these impoundments is leakage, seepage, leaching, running of the toxins in the coal combustion residuals out and into drinking water or groundwater, whatever, nature, people, that intuitively one would think that an unlined, which most of these are, or a clay-lined and earthen-lined enclosure would leak if water was running through it. And I take your position to be that the hydraulic head is the thing that pushes it out and that if you don't have infiltration of the cover, and you don't have infiltration of the cover, that there's a kind of different dynamic, a different hydrodynamic, and that the water that a layperson might think would run through and out doesn't. Am I wrong about that? Can you spell that out? Right. That is our position. But that is our position because that is what EPA said in 2015. In the Joint Appendix, in the risk assessment, page 595, 517, EPA explains that when you remove that hydraulic head, it removes the risk. This is the risk that you looked at in the USWAC case. In the preamble, page 357, EPA says this rule is designed to address the risk of operating impoundments with a large hydraulic head that creates the pressure that causes the condition that you mentioned. And you mean that to say that's exclusively the risk that it's looking at? I mean, that is the risk that the rule and the bevel amendment findings and everything else was designed to prevent. Right. And so if there's another risk that has now become apparent after years and years, then EPA needs to revise their criteria. The RCRA is not a zero-risk statute, right? And what we're talking about here is not whether the GAVIN facility does or not comply with the performance standards or whether there might be a possible risk of leaking. What we're talking about is a rule under which there can be zero contact. Contact is not leaking, right? Those are two separate things. EPA has said if there is any contact, any contact at all, again, this is in the GAVIN final decision at page 19. That alone is a violation. Well, have they defined what they mean by how they have in cases saturation of water in and out of here? And it seems to me they're not sure that they have yet identified an application of the rule in a non-saturation case. So I could be incorrect, but at this point for us, does the record show any enforcement measures against a non-saturated reservoir or storage area? I don't think we have an active enforcement case that is just zero contact. But what we're challenging... I'm sorry. We looked at the GAVIN case. That was clear enforcement. And I didn't ask about zero contact. What I asked was that was the case of serious saturation with water. Correct? That's what the dispute in that case is and that will be the dispute before the district court in that case. Right. So saturation is what they said they were relying on there. And so I was asking you to get your point of contact. Contact is one thing. Saturation seems to be a very different thing if we don't even yet know what they mean by contact. Because they've elsewhere said if there's contact, but you've got all the technologically available sort of best scientific measures and technology there to prevent contamination, then contact's okay. I'm saying we don't have a no contact. I don't think that's what they said, Your Honor. Okay. That's what I understand. They can tell me if I'm wrong. The question is, in a case like GAVIN, maybe we just don't even know yet at this very early stage how much contact is too much. But we've got a saturation case. And you're saying any contact at all, even if that contact has zero effect on water because the best storage technology and protections are in place. Is that the delta between you two at this point? Well, whether the GAVIN unit does, whether it's 10%, 20%, 30%, whatever it is, those would be resolved in a site-specific situation. What we're challenging here, what is the new criteria is a statement on... It's a site-specific decision in the GAVIN case. It is. It is. And the district court will sort that out. Absolutely. Well, we have to have an agency finding, at least, right? That's right. But we're challenging... Can I ask you a question? You gave a description of what we're talking about here in this case, and it's not clear to me. Where does the water come... The coal ash is put onto a sluice, they call it. And then water is put in there to keep the drive toward the pond. Is that it? Yes, Your Honor. Where does the water come? Where does the water come from? It could come from various sources at the plant. It could be other types of wastewater. It could be... Is it from a lake or a river? Is it groundwater or surface water? I'm not sure that it comes from the same place. That's a site-specific issue of where that make-up water would come from. It's like running water. They have some source of running water. It's probably some other process water or storm water at the facility in most cases. I know we've had nuclear power plants. They have to be located near a large body of water because of the need for cooling. I'm wondering... The reason I'm asking this is I'm just wondering whether that means that your type of power plant that burns coal has to be located near a source of water, which would indicate the possibility of contamination. It's not a 316A or 316B Clean Water Act type patrol that we're talking about. This is water that's some other kind of storm water. Whether or not... How the plant cools its boiler would be another issue. Maybe it doesn't need a 316A thermal water. There isn't. In the Gavin Power Plant, there is spotted water nearby, isn't there? I believe there is, but I would defer to Gavin. Mr. Gidia, are you... I'm having a little bit of trouble reconciling the way you're reading the 2015 rule. Surprisingly, that's the case about the way the EPA is. You refer to the infiltration as referring to infiltration through the cover. As I read the rule, if we look at D1 Romanet 1, that's referring to closure performance standard in general. Then there's D3, which references the final cover system. The final cover system also talks about minimizing infiltration, but before we get to the cover system, we have the general closure performance standard that requires that the owner or operator ensure that infiltration of liquids into the waste and release of coal combustion residuals, leachate, or contaminated runoff is minimized or eliminated to the extent feasible. I take your reading to be that that also is about the final cover? If you look at Romanet 4, the next one, for example, your honor, it mentions the unit. You can't infer... Romanet 4 says minimize the need for further maintenance of the unit. That's the reverse of what you just posited. The government's argument is that the beginning of D1 means that all of these things apply to the unit. That's what their brief says. That's their argument. All of these things apply to the unit unless they say otherwise. You can't infer that given the way that little Romanet 4... You can infer from its wording the... I'm sorry to interrupt you. You're not interrupting me. It says closure performance standard when leaving coal combustion residuals in place on the owner or operator of a CRR unit must ensure that at a minimum the unit is closed. Right. It doesn't say... That will control, minimize, or eliminate post-closure infiltration of liquids into the waste and releases of CCR leachate contaminated runoff. Then separately there's a provision about the cover. Right. A couple of points there, Your Honor. First of all, I don't think you can infer that all five of those apply to the unit from the introductory phrase. It just says that the unit has to be closed. You have to look at all five of those things on their own terms, right? So the question is, what does infiltration mean? What does it mean to minimize infiltration? Your Honor pointed to D3. That's a really good clue. That's the only other place where minimize infiltration is used in relation to the final cover system. Now, it doesn't say only, right? But to get to the only, you can back up to D13, Romanet 3. B? As in Boyd? B as in Boyd. 1, Romanet 3. Tells me if I'm closing in place, what is it that I have to do to comply with D? All of D. Not just D3, but also D1. What I have to do is design and install the final cover system and then I have to make sure that that final cover system complies with D, all of D. You're reading Romanet 3 to say that all you have to do to close in place is have a good cover system. I'm saying that that's how you read infiltration. That is the context that we have to understand that. You're saying that all you're required to do if closing in place is follow the cover system rules. Is that what I heard you say? Not D3. I agree. That the whole of D is a cover system rule. Yes, that is the context. If I'm going to interpret infiltration. You're talking about D or B? D, but B is back and forth. Sorry, I apologize. I apologize, Your Honor. The question really is what does it mean to minimize infiltration? The rule itself doesn't define infiltration, right? Granted. Kaiser says you go to the context, you go to the history. I want to specifically address the whole D3, D1 issue, right? EPA says, well, if we're talking about infiltration in the cover, that's D3. D1 has to mean something different. You're talking about Arabic 3, final cover system versus closure performance standard. Yes, Your Honor. EPA makes a big deal about those two and says, well, if it's covered under D, if your cover is addressed in D3, D1 must mean something else, but that's not true. What EPA explained in the final rule and what I think EPA conceded in its brief at page 37 was that the infiltration requirement is added to address comments about the final cover system. Because if you install a final cover system, there could be extreme circumstances, and the rule talks about this, desiccation or settlement, where even if it's designed according to the specific procedures under D3, right, then you could have an issue that you have to address anyway. It's those extreme conditions that you have to take account of in D1. That's why EPA said in the final rule that it's the final cover system that has to minimize infiltration. Look at the very bottom of page 37. That's why EPA said that provision was added to the regulation. I think I might be outstripping my coverage here, Your Honor. All different types of materials. D3 says it's got to have certain kind of clay and have a certain permeability and all these things. I'm not exactly sure about that. Sorry. Apologize. My technological ability is way less than yours here. Part of the argument would be that in D2 where it says free liquids must be have on it. One of your concerns is that as you read the EPA documents you have referenced, they are including with free liquids, groundwater. Is that correct? They are including within free liquids all groundwater, irrespective of whether it meets the rest of the definition of free liquids. That's the concern. Yes, Your Honor. Okay. My understanding, again, is you have these big I'm just going to call them pits for now. I guess they can be different shapes, but open pits that while they're actively operating can be there for decades collecting CCR. Then one day we say now we're stopping and we're going to close it and remove the free liquids. You define free liquids as I understand it has I'm sorry. There's a definition somewhere for free liquids. I don't have it in front of me. As you define it, does that mean it's something that comes from is it only liquid that comes from pushing the coal into this pit? It could be derived from anywhere. It's really not relevant where it's derived from. Could it be derived from groundwater too? What's relevant, this is what you have to remove are liquids that are readily separable from the waste portion of the pit, temperature and pressure. Groundwater is not limited in that way. There's a definition of groundwater that's just water under the surface. I understand, but if there is groundwater coming in to the residuals that has to be eliminated before closure. If it's readily separable and if it would that's an engineered judgment. Separable from what? I mentioned these other chunks of coal From the waste, yes. The CCR. But that's so we just they get all the water out so there's only the hard substances left. That's what this removal of free liquid is. Not all the water. It's all the readily separable liquids. It's not readily separable. There's pore space. It may not really separate. Those are engineering judgments on a case-by-case basis. I'm also having trouble with this because the water that is groundwater and the water that was sluice water or rain water or other water, presumably in ambient conditions would be all equally separable, no? Probably. I'm not sure. What is the common sense term? How is it that groundwater would not separate from the solid portion of the waste under ambient temperature and pressure as required under section 257.53? Because it's not under ambient temperature and pressure when it's under the ground. And that's the definition of groundwater. But if it were... If it met the definition of free liquids, it would need to be removed. Absolutely. Wait. So if it's the groundwater that has now gone into the pit where all this CCR is, then it would qualify as liquid that has to be removed. If it met the definition of a free liquid, it would, Your Honor. Yes. Okay. And that's an engineering situation. Readily separable. I can't stand here today and tell you what that means in every case. That's the point. Maybe I misunderstood your brief. You categorically say groundwater is distinct from free liquids. What you're saying is when they say groundwater can qualify as a free liquid, you're just saying, well, as long as it meets the ambient pressure and temperature. Readily separable. And the rest is points to the definition. And what we're really here about... And your answer to this pillar was that if it's in the mix there, it's just as separable as rainwater and as whatever water was that pushed out there. And then maybe the CCR itself just has some... Again, it may depend on where in the unit it is, right? Maybe it's less separable or not separable. I'm not... Does separable mean it can be removed? Does it mean it can be removed, right? Well, let's take what I think... Is that what it means? It can be removed without the clean closure approach, right? You don't have to actually take the entire hard pieces of this residual out. I assume it's removable. I don't think you have to vacuum out all of the water in the impoundment, which is what EPA's rule is saying here. What EPA is saying... So how do you get that from this definition? If it's readily separable, then get all the water out. It suggests that there's... Or says that there's liquid that is not readily separable. It is not readily separable, right? So if they're making a... The definition makes a distinction. And it's an engineering call. The course could be different. The pressure could be different. The depth could be different. Those are all engineering things that happen on a case-by-case basis. What EPA said in January of 2022 is if there's one inch of groundwater in the bottom of 100 feet of dry CCR, that you cannot close the unit with that condition, right? That if you have basically wet sand in the bottom, you have to remove all that CCR, remove the wet sand. What's different than an inch of water? Either way. That's kind of what the... There's actual water in there. If there's one inch of water in the bottom, that is the new rule that EPA says. Regardless of whether it's readily separable or regardless of whether it's a free liquid... How could you have an inch in there that wouldn't be separable? If it's an inch of water, it's definitely... It's not the rocks itself. It's an inch of water. There's different pressures and different pore spaces in the impoundment, Your Honor. I'm not here to say what exactly is readily separable, and I don't think that's really an issue. EPA is bypassing that completely. One of the things that's really hard to hear is given what you are saying is the new rule, these press releases and these proposed documents. We don't even know yet what they even mean in their proposals. I think we know. They said you cannot close a unit with contacting... You're objecting to this groundwater reference, but if we don't know what they mean, what readily separable means, is your disagreement about groundwater or is it about technological decisions about readily separable that haven't yet been encountered because, at least in the Gavin plant case, no one's talking about an inch of water at the bottom of the pit. They're talking about saturation. We haven't even confronted that yet. I'm not here to challenge the inch, Your Honor. That's the rule that EPA stated. Do you have a client that has an inch? Or does the record show that your organization has a member that has an inch? I don't have that specific information. You don't have it, then I don't know. I mean, if you don't have members that have that, I don't even know how it's right or how you have standing... I do have members, and it's cited in our reply brief, that do have impoundments with coal ash in contact with groundwater. How much contact? I don't know the exact... Then again, saturation point, you're saying you want to argue about the inch, but we don't know that there's any such entity that exists at all. We don't know whether or not they would deem that contact or not. You're telling me that they've said it will, and I'll take that forgiven for purposes of this question, but if you're not here to represent anybody, you can't tell me you're representing anybody who is dealing with the inch issue. And the only situation we have before us is a saturation issue, and saturation seems to be... This may be my misunderstanding. My assumption is if it's saturated, did we say 20, 30, 40 percent water, then there's some water that could be removed. Is that right? Here's what I do know, Your Honor. Let me go back to the, do I have a client with the one inch, okay? When EPA issued the January 2022 statements, it also issued a list of 116 impoundments that it believed violated that rule. Whatever it was, one inch, contact, okay? My clients are on that list. Well, no, you said they violated it. I don't know if they violated it. Did they say one of those folks violated it? No, they said they violated the water table rule, and that's a no contact rule. That's not what I'm asking. It's not even an inch. It's no contact. That's not what I'm asking. Because if all those people on that list have 10 percent saturation, we don't have to decide an inch issue. Well, EPA said they're in automatic violation of the rule, so we do have to decide that. We don't have the factual record on what basis they said that, do we? I don't think they do have a... You can't, they're your members. That's the problem. They've announced a rule that says no contact. You cannot close with contact. That's what they said. Yes. I understand that, but normally we look at agency positions in actual applications, and you're here arguing about a one inch situation. You can't tell me if any of the members you have on that list are in fact one inch as opposed to saturation. Can you or can you not? I do not know about whether it's one inch or not. Okay, do you know that any of your members on that list are less than 10 percent saturation? I don't have the exact numbers. I'm not asking for exact numbers. I'm just asking do you know if there's anybody... I don't know the exact numbers. There is a citation in our reply brief of comments that we submitted. When EPA finally did propose this, we submitted those comments. There's a citation of those comments. And I think to your point, Your Honor, I agree with you if this is if it's just site specific, right? If it's not a rule, if it's not a requirement, if we're not bound by it, if states and private parties are not bound by this rule, that you cannot close with ash in contact with the groundwater, if it doesn't have the force of law, if we're free to challenge it when they come after us, right? On a blank slate. And they're not citing these final and proposed decisions as authority in that case, which is what we suspect they intend to do. But if they don't do any of that, Your Honor, we agree it's a site specific inquiry. And that's how we think it should be resolved. That's how the Gavin case should be resolved. I thought your view was even something like the Gavin case where saturation at a very high level is improper. Do you agree that the application in the Gavin case was consistent? Is a straightforward application of the 2015 rule? What I know about the Gavin case is that we pointed this out in our brief, is that EPA didn't cite at all any violation of the groundwater protection standards. That's what I'm asking you. I don't have a position on whether Gavin, that Gavin situation Well, it seems like your brief is filled with, Gavin is an illustration of them applying. It is. On page 19, EPA says If the only, if what you meant by that was any contact, that's just not the facts of that case. So it's not what it illustrates. And if you mean by that, they can't have a 2015 rule would not support an interpretation that says saturation at 10, 20, 30, 40 percent is fully consistent with this regulation. That's a very different argument. My argument is that on page 19 of the final Gavin decision, EPA announced a rule that said groundwater contact alone, alone There's no lawsuit here that's pre-Gavin final decision. That's right. EPA said the same thing in January of 2022. Surface impoundments cannot be closed with coalescent contact with groundwater. Now, if EPA wants to say, maybe it's a more scientific question. When the rule says free liquids must be eliminated, if, factual if, but maybe neither of us knows, but more likely you would know than me, if that one inch is readily separable, and was readily separable at the time of closure, then it would violate this rule. Eliminated, right? If it was a liquid that was readily separable from the... Even if it's one inch, this rule requires its elimination. Free liquids must be eliminated. It meets the definition of free liquids. It has to be eliminated. What if it also meets the definition of groundwater? One inch at the bottom, groundwater, it's readily separable. You're mixing the two definitions. Well, that's part of what I'm asking. Part of what I'm asking is how much of your position dependent on groundwater being defined in a way that, in your view, cannot be free liquid? I think that once it becomes a free liquid, it's not groundwater anymore. Maybe it was groundwater and it became a free liquid, but it has to meet all the definitions, all the elements of the definition of free liquid, period. Obviously, water can become different things at different times. It can come in as groundwater and turn into free liquid. Actually, the second it comes in, it becomes free liquid because... I think that's an issue when you're trying to take it out. What does readily separable mean? You don't say there's something different about groundwater once it's in the mix with everything here. You're just saying that there's a test for a free liquid that involves its readily separable ability. It involves more than just the definition of groundwater. That's the definition of groundwater that EPA is using. It's using it in Gavin Final Denial. It's using it in January of 2020. Groundwater is a broader subject that can encompass free liquids, or free liquids is broader and can include groundwater that's... I keep calling them... I think your first example was the right one. Groundwater is broader than free liquids. EPA is expanding. Groundwater, rainwater, or the water that pushes the stuff into the pit, or water that... It's probably groundwater, but I suppose surface water can come in if a nearby river overflows its banks. All of those would count as free liquids as long as once they're in the pit, they're readily separable. They make the rest of that definition. Yes, correct, Your Honor. For a moment, I thought your position was more lucid to me. If there is liquid coming into the waste and if it is feasible to eliminate it as liquid waste, your position is that the original 2015 rule requires that elimination be made before the cover is put on. Are we still in the free liquids definition, Your Honor? I'm sorry. I think we're in both the infiltration of liquids and the elimination of free liquids, both. Well, I think you've accepted EPA's broad dictionary definition of infiltration in that hypothesis, Your Honor. We don't think that's what infiltration is. So you're saying that, yeah, so you're reading D1, Romanet 1, as duplicative of D3... No, the final cover system one. D3, which talks about installing cover systems and minimizing infiltration. Not at all, Your Honor. They're additive. EPA explained how they were additive in the final rule, which is also on page 37 of its brief, told us why the infiltration provision was put in there. It was to account for extreme conditions when the D3 criteria, the specific criteria, are not enough to stop the downward migration into the unit. That is what EPA said in the preamble to the final rule. That's the understanding that we've had ever since 2015. They're not duplicative  EPA said in 2015, with that specifically, if there is a unit with waste below the natural water table, does the CCR have to be removed? EPA said you can use either method. And the critical point is that if you have a violation of the groundwater protection standards, you may have to address and remove that CCR. It may be the best option. It's not the categorical rule that they said in January of 2022, Your Honor. When you say that they said in 2015 that you have a choice and that the rule does not require clean closure of any unit, I think they're still applying it that way, but they're also pointing out that there may, and there likely are, engineering changes that need to be made in order to keep it in place. They're not saying that in the response to comments, Your Honor. What they say in the response to comments is if you have that situation, and if there's a violation of the groundwater protection standards, which is not a condition of their new rule, then you may have to remove it. That's what EPA said in 2015, which is not what they're saying now. What they're saying now, any contact means you cannot close in place with that contact. The engineering measures, Your Honor, what EPA is saying is in the brief multiple times and in the final GAVIN decision, it's not that if you have contact, you have to take some engineering measures to prevent contamination. What they're saying is you have to take measures to remove the contact so that the rule is if you have contact, you cannot close in place. Now, if EPA wants to say, look, there's some situations, there may be one out there where you could have some contact with groundwater, you could close the unit that way, monitor, put 100 monitoring wells all around the site, improve for 30 years. If they would concede that, then we don't have a rule anymore. But that is the rule that they stated. But they're saying that you need some measures to remove the contact with groundwater. I believe, and we'll hear from them, because groundwater that is in contact with the waste and free and open to the rest of the environment is going to leach. You're adding a bunch of GAVIN facts that they wanted to add on? No, no, no. I'm reading the rule pre-knowing anything about your case about GAVIN, saying that there were no liners in most of these and when you have water and you have coal combustion residuals and you don't have a liner, the water takes the material away. Is that not the simplest problem? When you have the hydraulic head and what they said, when you take it... That's why I was asking whether hydraulic head is key to your position, because if you don't have hydraulic head, is your position as a matter of engineering that water is no longer going to flow even from an unlined facility? It's not my position as a matter of engineering. It's my position that that is what GAVIN said in 2015 when it designed a rule with two closure options and told facilities that you can. What is your understanding of the physical state of affairs that that rule is assuming? I think it's assuming that the hydraulic head is the only risk that's going to cause an unlined facility with water and coal ash residuals that there won't be any mobility of that out into the environment in ways that everyone agrees are hazardous unless there's hydraulic head. I'm not saying there's not a risk. You're not saying. I'm not saying there's not a risk. Okay. RCRA is not a zero risk statute. No, no, no. You're not saying. You're saying there's not a risk under the 2015 statute. Not a risk that the 2015 statute requires to be addressed. Regulation requires to be addressed. It does if there's a violation of the groundwater protection standards, Your Honor. Yes. But not in terms of deciding which closure option at the very beginning that you have to pick. If there becomes an issue, you do what EPA said in 2015. You monitor the groundwater. You may have to remove CCR in that situation. But it's not until the groundwater is contaminated is your position. It's not our position, Your Honor. It's not. It's your position. You may say it's also EPA's position, but that's your position. Right. Well, the groundwater monitoring has two phases. There's an initial phase that doesn't involve. You have to wait until your groundwater monitoring. You're not fine until the groundwater itself is contaminated. So your position is they have to wait until the groundwater is actually contaminated. The monitors are at the waste boundary. That's where they're required to be. They're not a mile off. They're not a half mile off. We've kept you up for a long time and we do have a lot of colleagues who were eager to hear from as well. Can you talk about what you think requirements means in 6976 A1? This is a little bit of a more new provision than a typical APA review. I think it means something that's more generally applicable. That's the hazardous waste case. I think it means, in our case, the solid waste criteria. I think that's really what's critical here about the statute is that it's criteria that have to be promulgated as a regulation. And so criteria are the things that we've been talking about today that divide an open dump from a sanitary landfill. So I think requirement, I think regulation does too, but I think requirement includes solid waste criteria. I don't think it includes... I agree with you. You said that you think regulation does too. And part of what I'm trying to understand, and this is not a challenge of your making, it's the statute. Why is requirement in there if regulation... They seem really close... I think they seem really close. And I think that I don't have an answer for that. I don't know the legislative history. I do know that your cases have discussed them separately. And I think it's the government's position that a requirement means everything. It's not a regulation. We clearly don't think that it's that open-ended. The Gavin extension denial is a requirement. We don't think that that's the case, Your Honor. I think it has to be something of more general applicability. One last procedural question. You'd ask for a vacature? That's right. How do we do vacature? Press release and letters of proposed decisions. You vacated press releases before in Crop Life, for example. You vacated frequently asked questions on a website. I don't think you actually erased them. Your decision describes what it is. And we've described the rules, the waste below the water table ban, the new definition of infiltration that just means... Vacated letters of proposed decisions or proposed actions? I'm not sure about proposed actions, Your Honor. But I think you have vacated parts of things, parts of informal things, right? And so that's all we're asking here, Your Honor. Do we have jurisdiction to review these documents if we think they are in effect an interpretive rule or guidance? I think if they are solid waste criteria, right? So the APA distinction between legislative rules and interpretive rules, right, where you only have to do procedures for legislative rules and not interpretive rules, doesn't really hold here because the APA says if the statute otherwise requires, then whatever you're characterizing as an interpretive rule does have to follow those procedures. So what's the hypothesis if we don't think that this is a rule that requires notice and comment rulemaking? Either type of rule? If we think it's just interpretive? Yes. Is your response to my immediate prior question that you don't... even if it's interpretive, it would require notice and comment rulemaking because it goes to criteria? I think if it's... Sorry. I think if it's an interpretation with a little eye, right, then you're saying we're not bound by it. It doesn't have the force of law. We can challenge it on a blank slate if they ever come against us. If it's not entitled to the type of deference that APA is seeking in some of these cases, then you would dismiss our petitions, right? You would say go handle it on a case-by-case basis. The problem is RCRA says if it's a regulation or requirement, you have to challenge it in front of this court and you cannot do it in a later enforcement action. So it's one or the other, right? Either it's solid waste criteria and it had to be promulgated as a requirement. We don't have jurisdiction. Or you would say that it's not binding? No, no, no. The district court would have jurisdiction. That's right, Your Honor. There's two choices here. I agree, Your Honor. One is it's a legislative rule. There should have been notice and comment. The other choice is it's not a legislative rule. If it's an interpretive rule, we don't have jurisdiction. You should have brought it to the district court. If it's not a solid waste criteria, right? If it's not a binding criteria, if it's not defining what it means to be an open dump, then yes, that's where it belongs. Defining is not the test from a legislative rule. It's a test for solid waste criteria. So solid waste criteria are the things that have to be promulgated as regulations. That's why the statute matters, Your Honor, because RCRA says you're going to issue these criteria. You're going to establish what's an open dump and what's not. Do it as a regulation. Talk to the state. You run into a doctrine of administrative law with that argument, and the doctrine is that it's totally discretionary by any agency subject to the APA, whether to proceed by rulemaking or by adjudication. We have informal adjudication here, and the Supreme Court in the NLRB versus Dall Aerospace case, I don't know if you're aware of it, in January, too, said that the agency can enact, in quotation marks, general rules through an adjudication. Unless it conflicts with the underlying statute, which is what the court said in NLRB, Your Honor. Here, 6944A says solid waste criteria must be regulations. So they do not have that discretion to establish rules or principles in an adjudication, which is what they tried to do here. Good answer. Thank you. It's an open dump. Yeah. With a little eye. Yes, Your Honor. Thank you. Thank you very much. Who's Van Bell again? May it please the court, I'm Stacy Van Bell again, and I'm arguing on behalf of Petitioner Gavin Power. EPA's actions at issue here in the Gavin final denial were designed to contain two things in the guise of this extension denial. First, the nationwide rulemaking, which Mr. Jader addressed, and second, the facility-specific compliance determinations that I will now address. In contrast to the nationwide rulemaking in the final Gavin denial, which is properly before this court, EPA's Gavin-specific compliance determinations are subject to the district court's jurisdiction. We filed the district court already, correct? We did file it, Your Honor. Yes. And respectfully, we filed this protective petition to preserve Gavin's rights because EPA raised this jurisdictional argument that this court had review under 6976A1 for the very first time in the final Gavin denial. So that wasn't something that was previewed to the parties that proposed, and so filed a protective petition, but Gavin, respectfully, Your Honor, believes the district court has jurisdiction for two reasons. First, the Gavin-specific compliance determinations constitute EPA's application of its regulations and requirements to a specific facility. And the case law in this circuit that has looked at that, and we acknowledge that the case law hasn't yet really defined specifically what requirements means to Judge Pillard's question, but all of the case law that has looked at specific application to a specific facility has found that this court lacks jurisdiction. And EPA doesn't cite to a single case that finds that this court has jurisdiction over a facility-specific termination. But second, and I think equally important, EPA's argument asserting jurisdiction under 6976A1 would deprive Gavin of its right to proceed in the district court to present expert testimony, and here particularly with this statute, Congress has determined that compliance and enforcement actions must proceed in the district court. And I say this, Your Honor, because under the Winn Act that was passed in 2016, Congress gave EPA for the first time enforcement authority directly over CCR, and in the provision 6945 D4A, which is cited in our reply brief, makes clear that that enforcement is subject to another provision in RCRA, which is 6928. 6928 is a provision involving compliance orders and enforcement actions and makes clear that the district court has jurisdiction. And indeed, this EPA's jurisdictional argument really would unjustly preclude Gavin or really any other facility from then subsequently challenging any findings that EPA made in the final Gavin decision if this court were to find it had jurisdiction because the statute itself says that action of the administrator with respect to which review could have been obtained under 6976A1 shall not be subject to judicial review in civil or criminal proceedings. What is your position on what requirement means? So, a requirement, it is undefined, but a requirement is not something that EPA specifically applies its existing regulations to a facility. Now, EPA says that the requirement here is the fact that EPA set a deadline. But that's not the case. The requirement actually to close the unit is in the CCR rule. And the mechanism for seeking a deadline are in the regulations. Those are the requirements. Just backing up a minute, you were talking about being deprived of an opportunity to develop a record, but isn't there a provision where there is review under 6976 for determinations for the record that are being simplified for us? So, your honor, EPA actually conceded in its brief that that provision doesn't apply here. And that makes sense because this is really a compliance determination. And these, under the statute, are matters that are developed in the local district courts. And so I think that we are in agreement with EPA that that does not apply here, your honor. Do you have any, you've mentioned that you think it's unclear. You don't have any particular insight or theory about what requirement means? We would argue it would be it would not be a facility-specific determination. And I think that is actually borne out by other parts of the statute, your honor. I referenced 6928, which is, again, going back to the compliance and enforcement. It's interesting because that portion of the statute actually does use the term requirement. And actually, let me read this to you specifically rather than paraphrasing it. It talks about civil penalties for past or current violation. When EPA determines that any person has violated or is in violation of any requirement in this subject I'm sorry, 6928? 6928A1. When any person has violated or is in violation of any requirement of this subchapter. And so it's basically making clear that the application of requirements in this subchapter, which really seems in this context it could be regulation or other criteria that EPA issues, then it makes clear that it's subject to that jurisdiction. And so I think that makes clear, your honor, that application of requirements as EPA has done here in applying the regulations, in applying the regulations regarding extensions of deadlines to a specific facility would not be what Congress has determined is in this court's jurisdiction 6976A1. And the case law makes clear that that provision is a limitation on the court's jurisdiction and it's limited to those actions. If what EPA did here is not to amend an existing legislative rule, but to announce an interpretation in an adjudication, is there any reason that that's reviewable under 6976? Well, to the extent that EPA is establishing a criteria of nationwide applicability then it would be. To the extent that EPA is establishing a legally binding prohibition on closing a surface impoundment with waste in contact with groundwater, which is what EPA says, that that would be subject. You very artfully re-described the terms of my question in a way that sidesteps it. Is there no category under RCRA given your understanding of what is a criterion? There's no category of a criterion that EPA has promulgated in 2015 and it is interpreting. Is that not a category in your view? Is it a binding interpretation or if you're just like Gavin it's going to come your way just as it did in Gavin? So as it came in Gavin the regulated entities didn't have notice of EPA's position. That's a separate question. Putting in the more traditional sense of either you promulgate a rule and or as the agency applies the rule it becomes clear in different applications on this fact pattern, on that fact pattern, how is this going to play out and it gives people one would hope if the legal system is functioning in a healthy way more notice, more nuance, understanding. So EPA could issue guidance for instance and there's case law under 6976A1 determines whether guidance is a requirement or a determination really looking on legal effect, right? This is legally binding on parties. EPA can do that and has done it under RCRA in other contexts. What EPA can't do just given the regulations and in particular 6944A is that is to create criteria, new criteria without going through the procedures that Congress intended in RCRA to do so. So your Honor, thank you very much and we would ask you to find that the court lacks jurisdiction. Thank you very much. ... that was very clear in its risk assessment that the hydraulic head is eliminated only when free liquids are eliminated when there was groundwater in a unit there is a hydraulic head but fundamentally this unit is leaking the risk that this court identified in EPA discussed at length in the 2015 rule is those from a leaking unit is that what you mean by contact with groundwater is leaking? no your honor contact with groundwater means that there is groundwater in the unit but the consequences of that and in the Gavin final decision assuming they eliminate I'm trying to change your rule just about ones where you thought you eliminated all the water but you didn't and so it was improperly closed so the whole things about the cover don't really matter because you didn't get all the water out but what if the water comes in if the water comes in after it's closed your inch of water then it can come in and go out that's right your honor if the water can come in it's going to go out if it's ground water flows through the unit then why would you answer no if contact means water got in it means either you didn't eliminate it before you put the cover on or it means you put the cover on but nonetheless because of some other problem groundwater got in are these the two options? your honor the regulation has several provisions that are meant to eliminate the free liquids and prevent water from getting back in the unit they have to do several independent things they have to number one eliminate the free liquids they need to drain the unit in kind of a colloquial sense if you have water in a water bottle full of sand you poke a hole in it and it drains out they have to do that if you just leave groundwater flowing through a unit you haven't done that you have to control eliminate or minimize to the maximum extent feasible post closure infiltration of liquids into the unit if groundwater is flowing through the unit that hasn't been done and then you have to also do the same for releases again if water is flowing through the unit collecting in waste leachates coming out you haven't done that and there's a final provision you have to preclude the future impoundment of water if groundwater is in the unit they haven't precluded the future impoundment of water it's still there is the point and when you haven't done that what the rule is saying is you have to do something I'm just asking something more simple okay helpful and I appreciate that but it sounds like if there so this thing is closed got a cover on an engineer sign off and then there's water in there and is that would that be evidence either if water got in is there a way water can come in without going back out not to our knowledge that if groundwater is flowing if we're talking about groundwater obviously it wasn't eliminated but if it's actually eliminated before they put the cover on then you talked about coming in and going out but I thought it would be the same thing if it can come in or it can go out or is the whole idea is that the cover prevents it from going back out the cover is not going to bring groundwater from coming back into the unit but if it comes in but the problem is if it goes out isn't it that's the problem well there's two problems there's infiltration into the unit coming in and then there would be releases from the unit coming out both are going to occur if groundwater continues to flow this is just sorry for my type of question if there's water in it why does that matter as long as the contaminated water isn't going out your honor the regulation what it requires it says eliminate free liquids so the liquids need to come out and then you need to eliminate post-closure infiltration of liquids I'm just asking why if the water magic door could only come in but it couldn't go back out then it wouldn't be any danger would it if it couldn't get in the unit that would comply with D1 you've addressed the infiltration and if water isn't coming into the unit it shouldn't be getting back out yet it's a different question if water has gotten in yes your honor they put it all out before they put the cover on and then it turns out there's water in there I'm just asking a very simple question of once there's water in there is that automatic evidence that water can be contaminated water can be going out may I take their central position to be no that once you eliminate the hydraulic head if there's water there it's going to be still it's not going anywhere your honor that's not the common understanding of how groundwater works and that's also not the record we have here and that's also not what the regulation requires when the groundwater is in there and I think the Gavin case is the important example here you have a unit that has 64 feet of groundwater flowing through it and they said we don't have to do anything to address the groundwater at all this seems like a particular thing though because it was in this sort of watershed area or stream there was because of the geography natural geography there's there's a reason to think the water moves what about a situation where there isn't that same reason to think the water moves is that a null set or and what do you point to your honor we don't have that record before the court well the record we have before the court is the Gavin final decision and EPA made some uncontested findings in there it was that there's 64 feet of groundwater flowing through the unit that the that the ground or actually does flow through the unit and that it will continue to do so indefinitely Fish and Air has offered no comments on those findings they are uncontested what they argued in their comments is that you just don't have to do anything the regulation doesn't require them to even address it I have some sort of terminological questions like if groundwater saturates the base of an impoundment does that mean that the base of the impoundment is situated in the uppermost aquifer like aquifer and groundwater mean the same thing in your view aquifer and groundwater are different but I think the sailing point with respect to this regulation is we're talking about free liquids groundwater is a liquid and when it readily separates from the waste under ambient temperature and pressure it has to be eliminated on that requirement this entire discussion though your honors I think highlights the fact that we're not talking about promulgation of a legislative rule these are all discussions about how it applies what the interpretation is I'm sorry to cut you off do you want to finish your sentence no your honor can you explain what the controversy is regarding below the water table your honor the petitioners have created a label for something that EPA didn't actually do they're saying that there's some prohibition from closing with waste in place if they call waste below the water table all EPA has done has said if you have groundwater in a unit and let's take the Gavin example as the example before the court that's a final agency action you got 64 feet in there you look at the performance standards you have to do something what's the definition of the water table water table I don't believe is defined in the regulations it's not a defined term maybe I'm asking you what the plaintiffs mean or the petitioners mean by that what's your understanding of what a water table is I'm not an engineer so I don't want to give a definition that's not geologically correct but I think that with petitioners they can better answer the question I think it's supposed to be the top of the water but regardless it's still a liquid EPA has used the same terminology itself so you can't really put out Scott Friesen it's just their language you have used water below the water table they pulled that from some document of yours sure and if we're talking about and again if we're talking about water below the water table and we're talking about groundwater here because this is the factual record that we have groundwater going into the unit regulation requires it Judge Randolph I do want to finish the point that I was making before because what we're talking about right here are some very nuanced interpretive discussions about what this regulation means in particular context how it applies that is not promulgating a legislative rule and you look at what EPA did and the gap in action that wasn't adjudication what's the definition of promulgate promulgate is to make known a law and the order that was issued I think a better way to say it it was a final action that applies to Gavin but it wasn't an order it wasn't a rule of any kind is there any time limit on the filing for judicial review in the district court yes your honor I believe the six-year general statute of limitations would apply I'm not a hundred percent sure that we could follow up with the court if that's a question you're interested but again when we're talking about an adjudication that results in an order we can't be talking about a rule because adjudications result in order not rules repeatedly what this court has done to determine if something is an order or rule they've looked at what the agency has done and if the agency is taking a facility specific application making site specific findings taking existing law and applying facts even if they're doing interpretation of existing law and rendering a finding action that is binding only on that party they say that's an adjudication it results in an order and this dichotomy is closed directly from the definition of order and adjudication in the APA itself and this court has noted most recently in 2023 in the IT Server Alliance versus DHS case once this court recognizes and if this court does recognize this is an application and interpretation which it is the legislative rule plan has to fail the due process claims that petitioners have made also have to fail too because they rest on this false notion that EPA has at some point changed its position on what this regulation how it applies they never have they've never said that you can close a unit leave groundwater flowing through it and comply with the performance standards 57102D in fact they said just the opposite in 2020 when they proposed an amendment to the rule and when they were discussing closer standards and these are the this is the section B that petitioners were referencing earlier they said if you have the situation where groundwater is in contact flowing through the unit you do have to do something and they were talking about that does contact mean flowing through the unit? that's what you just said is contact in contact and water flowing through the unit again when groundwater is in the unit it is going to be flowing through the unit if EPA is talking about contact yes, water will be flowing through the unit if groundwater is there and if you're taking a look at GAVIN that's what's going on in the record before the court on record literally contact could mean if the outer shell of the outer line outer side of the liner of this pit is touching water if they have the number one perfect liner and so none of that water that it's touching the grubs are on the outside of the liner is coming in that would not be what you mean by contact you mean water inside that's correct your honor, we're not talking about all combustion residuals are in contact with grub yes, that's right it's in the, I see now I'm sorry your honor, it's in the actual unit again we're not talking about units here that have liners in them we're talking about the the unlined units, that's why we have this problem the petitioners say that free liquids are defined by reference to ambient temperature and pressure in a way that categorically excludes groundwater which is below the surface of the land what's your response to that? your honor, it doesn't exclude in fact it's going to explicitly include it because groundwater is a liquid but groundwater as defined in the statute is below the surface of the land it talks about the location but the salient point for the purposes of free liquids is that they are liquids that readily separate from waste under ambient temperature and pressure and groundwater is a liquid, it satisfies the condition it's going to be a free liquid and it's going to have to be eliminated at closure is ambient temperature and pressure when the water comes in or it has to be separable is the ambient temperature and pressure describe the separability process? the ambient temperature and pressure is talking about the conditions so for example you're not heating it up or you're not making it artificially cold I think the example I gave earlier the conditions in the unit, I think the example I gave earlier is a good illustration of what the point is free liquids are going to be if you take a water bottle and you fill it up with water and sand and you poke a hole it's going to be what just drains out and so when you're talking about free liquids and the liquid you're talking about all the liquids in the unit, the rain water you don't have a water bottle, that would be a lined impoundment, you have a paper napkin so liquids that are going to separate from the waste come through your paper napkin if they could move around freely in the unit if they're going to come out, yeah those are the free liquids but there's no longer groundwater in the sense that it's no longer below the land surface the location of it it still would be groundwater it meets the definition of groundwater on the location but if it's also moving around the unit, it has the ability to do that it's also a free liquid and when it gets inside it can become a free liquid once it's in the unit and has the ability to move around freely, it's a free liquid, it can also be a groundwater if it's under the location what's pore water? I'm not sure your honor what pore water is that's something I can follow up with you on if interested in terms of beneficial use, yes your honor if a beneficial use is not disposal or placement at all then does the law placing CRR does placement of CRR in a unit to support the storage system violate 101 or not? yes it does your honor and the reason why is the object of the regulation that's being regulated is the unit itself, you have a regulated surface impoundment that has to comply with all these regulations when closure requirements are triggered under 101A, one of those requirements that apply to those units is you have to stop placing CCR in the unit beneficial use is something that creates a unit or doesn't, if you do a beneficial use, if you take it and you put in say some wall board that's a beneficial use, the wall board doesn't become a surface impoundment by doing that but if you already have a regulated unit, a surface impoundment subject to all the regulations, that unit has to comply and when it's going to close under 101A, the clear requirements are you have to cease placing the CCR in the unit and your honors, one of the arguments that petitions also make is this fair notice point that they didn't have fair notice of this well EPA has been clear from the beginning about what this regulation, how it's structured how it was created, it was modeled on the subtitle C regulations for surface impoundments it borrowed language from them and EPA has been clear that in subtitle C you can't just close a hazardous waste surface impoundment and leave ground water in it it adopted that language, it noted it in the federal register it promulgated the rule and it used language that was written broadly, EPA was particularly concerned about the risks of units that leak they were aware of historic practices where units had ground water in them and they drafted this broadly written regulation and when you look at the actual terms of it, you have to address ground water, you have to do something you have to eliminate free liquids, you have to preclude future impoundment of water, you have to control, minimize, or eliminate infiltration and independently releases from the unit. Petitioners do not address the release prong Is there a difference between liquid waste and free liquids? If ground water comes in contact with coal ash by definition it sort of becomes liquid waste That's EPA's position your honor, yes if ground water gets into the unit and it co-mingles with the coal ash and all the other water in the unit, everything that is being managed in the unit is a waste and it's subject to elimination But it also can be free liquid if under ambient temperature and pressure it is separable? That's right, if it's a liquid in the unit, so you have liquid filled with units, there's many sources, you have sluice water, you have rain water you have water that's flowing into the unit to remember these are just basically open holes where you put, dispose of things and here they're unlined, the water mixes together all of the liquid can be a free liquid under ambient temperature and pressure, it is separating from the unit meaning it has the ability to freely move around. So all liquids are covered under that, just like for infiltration we're talking about all infiltration not just the side or the bottom or the top it's all infiltration Does this court have any questions? No Thank you, your honors Is it Kearney? Did I say it right? Kearney, I apologize. It's okay Good morning or perhaps now afternoon, your honors May it please the court, my name is Gavin Kearney and I represent respondent intervenors in this matter We respectfully request that this court rule in favor of respondents as it's presented with only one reasonable construction of the 2015 rule. The planned language of the rules closure requirements make clear that they cannot be met with surface impoundments where waste remains in contact with groundwater By affirming this, the court can lay to rest an issue that's delaying proper closure of surface impoundments that are polluting the environment around the country Protecting groundwater from contamination has always been at the heart of EPA's work around solid waste A couple of things I want to address really quickly that came up earlier some of the definitional questions and I also want to point out during the discussion with petitioners there was a question as to whether they are saying that groundwater is categorically not food liquids and in fact in the brief on electric energy one on pages 42 to 43 they do say that groundwater is not that free liquids does not encompass groundwater Judge Pillard, you had asked earlier whether groundwater can be static in essence. Generally speaking, groundwater flows Is it conceivable that at a particular point in time that a body of groundwater could not be moving? It is It's not reasonable or realistic to believe that over the lifetime of a surface impound the ground water is going to remain static and not continue to flow The question of the water table What does it mean when waste is below the water table? The water table is essentially the uppermost limit of an aquifer. So if you imagine groundwater is existing in a body of water that's also integrated with the ground with dirt, with rocks, etc the table is the top of that body. Here we're dealing with surface impoundments that are unlined where the waste itself is below that water table, meaning that it's in contact with groundwater that is flowing in and out of the surface impoundment It's below the water table but they have I don't deal with unlined here, but if they have you have pits that have the best technology available to keep water out then that would suffice It is possible to satisfy the requirements of the rule particularly with a liner as you pointed out earlier Is it possible to satisfy when it's unlined depending on the nature of the surface? There are measures that can be taken, engineering controls that have come up that can be offered to demonstrate that it is eliminating this possibility to the maximum extent practical Do you have a sense of what that might be? It's hard to envision if something has been unlined and therefore the waste is basically in a hole in the ground and huge hundreds of acres with hundreds of tons It's hard to envision how water could be controlled other than with a liner It is hard to imagine in the circumstances that Gavin Power presents that engineering controls alone would be sufficient to address the requirements of the rule. What are the kinds of engineering controls? Maybe a smaller dryer There's something called a slurry wall which is a sort of wall that goes around the outer limits of the impoundment which can be combined with a pumping system where you're addressing pressure that would cause flowage that would cause leachate, etc. One thing that's worth noting is that in 2017 following the publication of the CCR rule, EPA put out guidance online and in the guidance they talk about a circumstance in which a surface impoundment, an unlined surface impoundment could be submerged in part by the aquifer and what they say in that instance is one way that you could meet the requirements of the rule is to excavate that portion of the surface impoundment that's submerged in the aquifer and use controls for the rest of it It makes clear that closure in place is an option but as they make clear in the rule itself, there are a variety of measures that could be taken. The real issue is have you met the performance standards of the rule through the measures that you're proposing to take Any other questions? Do you have a position on the meaning of requirements under 6976A1? Your Honor, we support petitioners or we support respondents' position on this. We understand it's not defined in case law. We do think that it's a separate term under RCRA. RCRA does say regulation or requirement and so given it's ordinary meaning, EPA has in fact here imposed a requirement upon Gavin Power. Is it really a new requirement given that the rules require that even impoundments eligible for extension have to close by no later than October 15, 2023? It's a new requirement in the sense that... Special circumstances. Go ahead. In the sense that the Part A amendments to the COLASH rule, which is what this comes under, don't obligate EPA to a specific timeline after closure. They do set an outward boundary, but they don't set a deadline within that. So in that sense, we agree that it's a new requirement. Any other questions? All right. Thank you very much. Thank you. I think we have three minutes. Before we allow... I want to address the moving in and out question, Your Honor. There's no evidence or finding in the record that contact means flowing in and out. If you look at the final Gavin decision on page 15, EPA just says it has the potential to do that. And we just heard intervener counsel say generally speaking water would flow in and out. EPA didn't say in January of 2022 generally speaking you can't close in fashion contact with groundwater. It said in no case can you do that. And it is the going out that matters, Your Honor. The water and the CCR in the unit is disposal. That is what the statute provides. Regardless of whether you're a sanitary landfill or an open dump, the statute under the statutory definition, even post closure, says solid waste in water is disposal. The question is does it comply with the criteria? And here those criteria do not contain a contact prohibition. They don't say anything about waste below the water table. Those are all made up terms. Can I ask a question? There's an issue in this case about tanks as storage facilities. Do you have members that have to make sure that you have members that have tanks that are in excavated areas of the ground and partially into the ground? Yes, Your Honor. I believe that the recipient of that particular letter is a member of USWAG. I think that's documented in the declaration. I think the USWAG declaration mentions other members. Perhaps not by name, but it does. And do you have other members or other members that are planning to add CCR beneficially to their service endowments? I think that the USWAG declaration also establishes that, Your Honor. And again, that they actually are planning to do that. I believe that's what the declaration established, Your Honor. Yes. Again, we're just here to ask for a level playing field. Either EPA, it's a binary choice, Judge Randolph said. Either EPA January 2022 statements are binding solid waste criteria and they must be vacated because EPA didn't follow the rules. Or they're non-binding, just discussions as Innovators Council referred to them. And if that's true, they don't have the force of law, we're free to ignore them without prejudice and challenge them later. And they won't be entitled to deference. I think this issue, as the court's other decisions have recognized, it's bigger than EPA and it's bigger than CCR. Do you think you get to ignore it? If it's an interpretation, I believe. If it's not binding, that's the definition of a legislative rule. Well, interpretation tells you what the legislative rule means, which is binding. If it's binding in any respect, if it's an interpretation with a little i, the only way... Interpreting a term in a legislative rule. 2015 is a legislative rule. Interpreting a term in the legislative rule. I don't know what you mean by your little i. You seem to keep meaning that it doesn't mean they're serious about it. In the context of RCRA... If the agency does, if they say what we mean by infiltration, what that regulation means when it says infiltration is X. And that's held to be an interpretive rule. Your position is that you clients don't have to... No, if it's held to be an interpretive rule, our position is a solid waste criteria and it has to comply with 16944. Interpretive rules under RCRA is your position. There can be if they're promulgated as criteria and they follow... No, they have to be legislative. If you follow the... Well, that's an APA distinction. That's an APA distinction. If you want... I'm asking you a very simple RCRA. Right, under RCRA. Not APA question. If you're reading of RCRA, that there can be no interpretive rules which clarify the meaning and content of a legislative rule and its criteria unless they are promulgated through notice and comment rulemaking. Unless they comply with 16944A. That's right. Because in your view, an interpretation of an existing criterion is itself a criterion. If it establishes... If you're relying on the criterion, criteria have to be promulgated in RCRA, right? If it establishes a difference between an opened up and a sanitary landfill, yes, Your Honor. And that's what these statements do. That's what we've been talking about this morning. What does it take to meet the standard under the statute? That's all we've been talking about. Any other questions? Thank you very much to all counsel. The case is submitted.
judges: Millett, Pillard, Randolph